Bea K. CROSS, Trustee, Bea K. Cross, Individually, and Charles Cross, Appellants,

v.

DFW SOUTH ENTRY PARTNERSHIP, Appellee.

No. 20754.

Court of Appeals of Texas, Dallas.

Feb. 18, 1982.

Edward S. Koppman, Melinda G. Jayson, Akin, Gump, Strauss, Hauer & Feld, Dallas, for appellants.

J. Kent Newsom, Newsom & Newsom, Dallas, for appellee.

Before GUITTARD, C. J., and CARVER and STOREY, JJ.

CARVER, Justice.

Bea K. Cross, who, as Trustee, sold unimproved land, and Charles Cross, upon whose influence and at whose instance the purchaser bought the land, appeal a judgment on a jury verdict in favor of the purchaser, DFW South Entry Partnership (DFW), for the return of DFW's investment, plus interest. The jury found in favor of DFW on the theory that sale of the land was a "security," which had not been registered, as required, under the Texas Securities Act. We reverse and render.

The evidence at trial was provided by the testimony of two of the multiple partners in DFW, some deposition testimony of Charles Cross, and various exhibits admitted at the instance of DFW. Neither of the Crosses appeared or testified. The land transaction is reflected in a written contract dated August 22, 1974 between "B. K. Cross Trustee," as seller and "Ronald G. Corley, M.D., Trustee," as purchaser, describing 8.767 acres to be sold for $0.7965 for each square foot as surveyed. The contract required 10% of the purchase price to be paid in cash and the

balance to be evidenced by a promissory note, without personal liability, with interest at 8½% per annum, payable in installments which concluded on the anniversary of the note in 1985. The promissory note was described in the contract as a "wraparound" note and the deed of trust lien, given to secure the note, was expressly subordinated to a "prior deed of trust executed by B. K. Cross, Trustee, for the benefit of Charles H. Crockett."

Subsequent to the land contract, Corley organized a general partnership named DFW South Entry Partnership by an agreement in writing dated November 21, 1974. Corley subscribed to a 25% interest therein and was the only initial subscriber. The partnership agreement recited that Corley's contract to purchase the land from B. K. Cross, Trustee, was in the capacity of a trustee for the partnership and that he would perform that contract in his name as trustee for the benefit of the partnership. The partnership agreement also provided for the appointment of a "Manager" and Airport Properties Inc. was named as manager by an endorsement written on the partnership agreement itself. The land contract was closed in June 1975 with Corley, Trustee, taking title and executing the note, and deed of trust securing the note, for 90% of the purchase price. DFW made no payments on the land beyond the down payment and some prepayments of interest, which were both collected at the closing in June 1975. In 1976 DFW filed the present suit which, by the third amended petition, asserted first that Charles Cross made the following fraudulent misrepresentations:

1. That the purchase of the property should be regarded as a good investment.

2. That investing in land is the best investment a person can generally make.

3. That he was well skilled in real estate investing for land surrounding the D/FW Airport.

4. That he had a concept for developing a large portion of the property near the South Exit of the airport which would include a "Food Fair International" development that would integrate in with an "International Exposition Center" to be located nearby. The exposition center would have a coliseum sports center, financial center, transportation center, amusement park and light industrial warehouses.

5. That he was helping to promote the development of the area and the subject property was included in his plans.

6. That the partnership should be able to quickly resell the property at a substantial profit.

7. That a business known as "Food Fair International" was already interested in buying the property from the partnership.

As a result of these alleged misrepresentations, DFW claimed it suffered actual damage in the amount of $131,908.44 (its total investment), plus exemplary damages. DFW's third amended petition also asserted that the sale of the property to DFW by "the defendants" (Charles Cross and Bea K. Cross) was an "investment contract," and thus a "security," which security was sold without being registered and such sale violated the Texas Securities Act. DFW's damages under its second cause of action was the recovery of its investment, the same $131,908.44.

By their verdict, the jury found (1) that Cross represented that Food Fair International would repurchase the land from DFW at a profit, but that this representation was not false; (2) that Charles Cross represented he had special skill and knowledge in developing and promoting property, such as DFW purchased, and would use that expertise to enhance the value of the particular land that DFW purchased from B. K. Cross, Trustee; that such representation was false; but that Charles Cross did not know of such falsity; (3) that DFW entered in the land purchase with the expectation of making a profit; (4) that DFW was led to expect a "profit due solely from the efforts of Charles Cross" as well as "a profit due solely from the efforts of Airport Properties Inc.;" (5) that Charles Cross was not the owner of the property sold to DFW; (6) that Bea K. Cross was the

real estate broker who sold the property to DFW "on behalf of Charles Cross;" (7) that Bea K. Cross was to receive a commission; and (8) that DFW had invested $126,742.85 in its purchase. Upon this verdict, the trial court rendered judgment in favor of "Plaintiff against Defendant" (without naming either defendant) for $126,742.85, plus accrued interest of $52,277.00, plus interest after judgment, and taxed all costs "against *Defendants.*" From such judgment both Bea K. Cross and Charles Cross appeal.

DFW concedes that the jury's verdict did not warrant any relief upon its cause of action for fraud against Charles Cross; however it maintains that the judgment in its favor is supported by the jury's verdict on its cause of action against both of the Crosses for selling an unregistered security.

The Crosses separately urge on appeal that the evidence fails to show that the property sold to Corley, Trustee, was a "security" regulated by the Texas Securities Act so as to be required to be registered or justifying a penalty if unregistered. DFW concedes that, where land is purchased on the ordinary prospect that the market value thereof would be enhanced in the future by market forces alone, the purchase is neither an "investment contract" nor a "security" and need not be registered under the provisions of the Texas Securities Act. *See* Tex. Rev.Civ.Stat.Ann. art. 581–4(A) (Vernon 1964); *Wilson v. Lee,* 601 S.W.2d 483 (Tex. Civ.App.—Dallas 1980, no writ); *McConathy v. Dal Mac Commercial Real Estate Inc.,* 545 S.W.2d 871 (Tex.Civ.App.—Texarkana 1976, no writ). However, DFW urges that it has also been held that a land sale can be an "investment contract" (which is a "security" under federal security regulations) if the land sale is a part of a transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely or substantially from the efforts of the promoter of the scheme. *See S.E.C. v. W. J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). DFW points out that, since the definition of a "security" under the Texas Securities Act is in an unusually broad form, the Texas Courts have followed *Howey* and held that an "investment contract" meeting the test of *Howey* is also a "security" under the Texas Securities Act. *See Searsy v. Commercial Trading Corp.,* 560 S.W.2d 637 (Tex. 1977); *King Commodity Co. of Tex. Inc. v. State,* 508 S.W.2d 439 (Tex.Civ.App.—Dallas 1974, no writ); *Bruner v. State,* 463 S.W.2d 205 (Tex.Cr.App.1970); *Koskot Interplanetary Inc. v. King,* 452 S.W.2d 531 (Tex.Civ.App.—Austin 1970, writ ref'd n. r. e.). Additional authorities following *Howey* also hold that a "common enterprise" means that the investor and the promoter have their fortunes interwoven with each other and resting upon the success of the common enterprise. *Clayton Brokerage Co. v. Mouer,* 520 S.W.2d 802 (Tex.Civ.App.—Austin) 531 S.W.2d 805 (Tex.1975) (writ dism'd). However, when a promoter sells land without any collateral management agreement between the promoter and the new owners there is no "common enterprise." *Woodward v. Terracor,* 574 F.2d 1023 (10th Cir. 1978). It has also been held that in order for "profits to come solely, or substantially, from the efforts of the promoter," the investing owners must be so dependent on the promoter that they can neither replace him nor otherwise exercise ultimate control over their investment. *Williamson v. Tucker,* 632 F.2d 579 (5th Cir. 1980).

■ Relying on the foregoing authorities, Bea K. Cross urges that under the evidence, there was neither a scheme common to her and DFW shown, nor were her fortunes interwoven with DFW's fortunes in any manner. We agree. The testimony offered by DFW failed to show either that DFW had an interest in the profit, if any, that Bea K. Cross realized on the sale of the property or that Bea K. Cross had an interest in the profit, if any, DFW expected to realize by its re-sale or development of the property. The absence of any common scheme between Bea K. Cross and DFW defeats the application of the *Howey* test to the transaction between them.

Additionally, Bea K. Cross urges that since she did not ask for, or accept, or

render, *any* management duties in connection with the property following the sale to DFW, there could be no expectation of profit *solely* from her efforts. We agree. The testimony of DFW failed to show that any managerial or entrepreneurial services were expected of Bea K. Cross in DFW's re-sale or development of the property. The absence of any expectation of profit to DFW to result solely from the efforts of Bea K. Cross likewise, defeats the application of the *Howey* test to the transaction between them. Since the sale of the land to DFW did not meet the *Howey* test of a "security" in either of its particulars, we hold that Bea K. Cross did not sell DFW a security required to be registered under the Texas Securities Act. Consequently, the judgment imposing a penalty upon Bea K. Cross for selling an unregistered security has neither factual nor legal support in the evidence and must be reversed and rendered in her favor with costs.

■ Relying upon the same authorities, Charles Cross urges that the evidence fails to show any common scheme between himself and DFW or that the common scheme's success, if a common scheme was shown, rested solely upon his efforts. DFW responds that a common scheme between it and Charles Cross was shown by its evidence that Charles Cross successfully persuaded DFW to purchase the property. DFW then urges that the success of the common scheme was shown to rest "solely upon Charles Cross" by its evidence that Charles Cross had stated that he was associated with the corporation appointed by DFW to manage the property. DFW is unable to point out any case where the promoter (or persuader), who was himself neither buyer nor seller, has been held to be involved in a common scheme with the buyer of real property. Neither, has DFW been able to point out any prior case where the promoter's, association with the corporate manager selected by the buyer, has been held to establish that the success of the buyer's purchase rest solely upon such associate's efforts rather than on the efforts of the appointed corporate manager. We are not persuaded that the evidence

relied upon by DFW warrants the conclusion it urges.

Moreover, we draw the opposite conclusion from additional evidence also offered by DFW. DFW offered into evidence, as its Exhibit 1, the written agreement creating DFW as a general partnership. Within such agreement there was included provisions for the appointment of a manager; such manager's authority and fee; and providing for the manager's termination and replacement. In contrast with the managerial contract in *Howey*, which was irrevocable for 10 years and gave the manager exclusive discretion in the operation of the citrus groves involved, the DFW partnership agreement provided that:

> *Management*: Control of the Partnership and all of its affairs shall be with the Partners. The Partners hereby delegate to the Manager the responsibility for the day-to-day management and ministerial acts of the Partnership, but the Partners reserve the right to terminate Manager as herein provided with any cause or explanation.

It cannot be said that the foregoing language shows sole dependence by DFW on its manager, or on Cross if he was associated with the Airport Properties, Inc.; or that DFW was unable to exercise ultimate control over its property. Likewise, in contrast to *Howey*, which gave the manager a substantial share of the profits of the citrus grove, the DFW partnership agreement provided no share of profits to the manager (or associate Cross) but only a fee based on initial contributions of the partners as follows:

> A one time initial expense amount of twelve (12%) is provided in the Initial Contributions for Initial Expenses and will be paid to Manager by the Partnership for the full life of the Partnership or until Manager is replaced.

The evidence showed that each subscribing partner to DFW paid a surcharge of 12% of his subscription amounts to fund this fee. It cannot be said that the foregoing language shows that the fortunes of DFW and

Airport Properties, Inc., its manager (along with Cross if he was associated with Airport Properties, Inc.) were interwoven with each other. To the contrary, the fortunes of each were contractually separated from each other. In *Williamson v. Tucker*, 632 F.2d 579 (5th Cir. 1980) it was held that:

> An investor who retains control over his investment has not purchased an interest in a common venture "premised on the reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others," even if he has contracted with the vendor for the management of the property. *Fargo Partners v. Dain Corp.* [540 F.2d 912 (8th Cir. 1976)], supra; *Schultz v. Dain Corp.* [568 F.2d 612 (8th Cir. 1978)], supra. So long as the investor retains ultimate control, he has the power over the investment and the access to information about it which is necessary to protect against any unwilling dependence on the manager. It is not enough, therefore, that partners in fact rely on others for the management of their investment; a partnership can be an investment contract only when the partners are so dependent on a particular manager that they cannot replace him or otherwise exercise ultimate control.

*Id.* at 599. Since DFW retained ultimate control of its investment and profits, its management contract with Airport Properties, Inc. (and Charles Cross, if his association be conceded), would not support a conclusion that, under *Howey*, DFW had purchased an "investment contract" or "security." We conclude that the judgment imposing a penalty upon Charles Cross for selling an unregistered security has neither factual nor legal support in the evidence, consequently, the judgment must be reversed and rendered in his favor with costs.

Reversed and rendered.